_____

No. 95-2820
No. 95-3036
_____

United States of America,                    *
                                             *
      Plaintiff - Appellee/                  *
      Cross Appellant,                       *
                                             *
                                             *  Appeals from the United States
      v.                                     *  District Court for the
                                             *  Western District of Missouri.
                                             *
Swaran Kumar Jain; Center for                *
Mental Health Services, Inc.,                *
                                             *
      Defendants - Appellants/               *
      Cross Appellees.                       *

_____

            Submitted:  April 11, 1996

               Filed:  August 8, 1996
_____

Before BOWMAN, BEAM, and LOKEN, Circuit Judges.
_____

LOKEN, Circuit Judge.

      Psychologist Swaran Kumar Jain and his corporation, the Center for
Mental Health Services, Inc., appeal their convictions for violating the
mail fraud and Medicare anti-kickback statutes by receiving payments from
a psychiatric hospital for referring patients to that hospital.  Defendants
argue that the district court's jury instructions erroneously defined the
term "willfully" in the anti-kickback statute, and that the government
failed to prove mail fraud, that is, a scheme to deprive Dr. Jain's
patients of their intangible right to his "honest services."  The
government cross-appeals, contending that the district court erred in
determining the improper benefit conferred by the kickbacks for purposes
of sentencing Dr. Jain under U.S.S.G. § 2B4.1(b)(1).  We reverse the
convictions for mail fraud but otherwise affirm.

# I. Background.

We must view the evidence in the light most favorable to the jury's verdict. The government's key witnesses were two former administrators of North Hills Hospital ("North Hills"), an acute-care psychiatric hospital which opened in Kansas City, Missouri, in 1988. Dr. Jain was then a psychologist in private practice in Leavenworth, Kansas, operating an outpatient therapy clinic and supervising as many as fifteen affiliated psychologists and counselors. The first North Hills Administrator testified that his mid-1989 letter promising that North Hills would pay Dr. Jain $1,000 per month for "marketing" was in fact an agreement to pay money for patient referrals. This witness testified that Dr. Jain provided no documentation of any subsequent marketing services; instead, their conversations repeatedly linked the payments to Dr. Jain's substantial volume of patient referrals:

Q. Can you compare the nature of these conversations with Dr. Jain with your other experience with professionals over the years?

A. Well, it is not unusual for professional people to want to affiliate with hospitals. . . . It is unusual, though, very unusual for a professional person to make it so clear that they are willing to exchange patients for money.

Q. Have you ever had that happen before?

A. Not in such an open manner.

Q. Was there any question in your mind what Dr. Jain was offering in exchange for the hospital to pay money?

A. There was no question at all.

Q. And what was that?

A. Money in exchange for patients.

The next North Hills Administrator testified that Dr. Jain provided little if any tangible marketing support, demanded

increased payments, threatened to refer his patients elsewhere if the payments were not increased, and at one time showed the Administrator a letter from a competing hospital offering to pay $2500 for each referral. The payments ceased in October 1990, when a new North Hills Administrator refused to continue the practice.

Dr. Jain testified for the defense. He insisted that North Hills' first Program Director, who did not testify, agreed that North Hills would pay Dr. Jain $100 an hour to provide mental health workshops and other promotional activities in the community. Thus, the letter from the first Administrator did not accurately reflect the understanding. According to Dr. Jain, North Hills persistently under-compensated him for time devoted to these marketing activities, which ultimately led him to terminate the fee arrangement. Dr. Jain directly contradicted the Administrators' testimony. He claimed there was no letter from a competing hospital offering $2500 per patient referral, and he adamantly denied ever requesting money for patient referrals. Indeed, he asserted on direct examination that such conduct would be "stupid," "illegal," "unethical," and "wrong." Nonetheless, the jury obviously believed that he did it.

Between July 1989 and October 1990, North Hills made nineteen payments totaling $40,500 to Dr. Jain, with the payments increasing in amount and frequency during 1990. He referred forty-nine patients to North Hills in 1989 and 1990. One was a Medicare beneficiary. Thirty were insured by the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), a Defense Department program that provides medical benefits to the spouses and unmarried children of living and deceased members of the military services. The rest were privately insured.

Though the government had strong evidence of a patient referral "kickback" scheme, it had no evidence of tangible harm to Dr. Jain's patients. The government conceded that each patient

referred to North Hills was appropriately hospitalized. Several government witnesses testified that North Hills was likely the best acute-care psychiatric hospital in the region. One of Dr. Jain's colleagues, who had no knowledge of the North Hills fee arrangement, testified that he referred patients to North Hills because it was the closest psychiatric hospital to their practice in Leavenworth, because North Hills had a very good staff and program, and because Dr. Jain's clinic had good relations with the staff and easy access to the facility. This psychologist also testified that Dr. Jain "was very professional in his interactions with patients, very caring. He put the patient's well-being as his highest priority." These views were echoed by another government witness, a psychiatrist on the North Hills staff who was also unaware of the fee arrangement. In addition, no witness claimed that any patient received unnecessary care or excessive hospitalization. Thus, there was no proof that any government insurance program suffered a financial loss.

After the jury convicted defendants on all nineteen counts of the indictment, they filed post-trial motions to set aside those convictions. Count One charged a conspiracy to defraud the United States by soliciting kickbacks for referring Medicare and CHAMPUS patients to North Hills. The district court vacated this conviction on the authority of United States v. Porter, 591 F.2d 1048 (5th Cir. 1979), and the government does not appeal. Count Three charged Dr. Jain with bribing North Hills officials. The district court vacated this conviction because defendants paid no bribes, and again the government does not appeal. However, the district court upheld the convictions under Count Two, which charged violations of the Medicare anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(1)(A), and counts Four through Nineteen, which alleged a scheme to deprive Dr. Jain's patients of his honest services as a psychologist in violation of the mail fraud statutes, 18 U.S.C. §§ 1341, 1346. The district court sentenced Dr. Jain to five years probation, including six months of home detention, and

a $10,000 fine.  It imposed special assessments of $850 on Dr. Jain and $3400 on the corporate defendant.  Defendants appeal the convictions; the government cross-appeals Dr. Jain's sentence.

## II. The Medicare Anti-Kickback Convictions.

Defendants argue that the district court's instructions incorrectly defined the term "willfully" in the Medicare anti-kickback statute.[1]  We will uphold an instruction on the *mens rea* element of a federal crime if it "fairly and adequately" sets forth the statutory requirement.  United States v. Otto, 64 F.3d 367, 370 (8th Cir. 1995), cert. denied, 116 S. Ct. 956 (1996).

The parties assert radically different positions on this issue of statutory construction.  Based upon the traditional principle that ignorance of the law is no defense, the government urges us to apply the general rule that "willfully" in a criminal statute "refers to consciousness of the act but not to consciousness that the act is unlawful." Cheek v. United States, 498 U.S. 192, 209 (1991) (Scalia, J., concurring).  Defendants urge us to adopt the exception to that general rule that has long been applied in criminal tax cases -- willfulness in a criminal tax statute means

---

[1] 42 U.S.C. § 1320a-7b provides in relevant part:

**(b)  Illegal remunerations**

> **(1)** whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
>
> > **(A)** in return for referring an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under [Medicare] . . .
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

the "voluntary, intentional violation of a known legal duty." <u>Cheek</u>, 498 U.S. at 201. Defendants rely most heavily upon <u>Ratzlaf v. United States</u>, 114 S. Ct. 655, 663 (1994), which extended the standard applied in tax cases to criminal prosecutions for "willfully violating" the anti-structuring provisions of the Money Laundering Control Act of 1986, 31 U.S.C. § 5322(a) (1993).

The district court adopted a middle ground. The court declined to instruct the jury that Jain must have intentionally violated a known legal duty because the anti-kickback statute prohibits willful conduct -- receiving remuneration for referring patients to a Medicare provider -- rather than the willful violation of a statute, as in <u>Ratzlaf</u>. But the court also concluded that a *mens rea* instruction more rigorous than the traditional rule was appropriate because the literal language of this statute might otherwise encompass some types of innocent conduct. Accordingly, modifying language found in 2 Edward J. Devitt, Charles B. Blackmar & Kevin F. O'Malley, <u>Federal Jury Practice and Instructions</u> ¶ 30.05 (4th ed. 1990), the court instructed the jury that "the word 'willfully' means unjustifiably and wrongfully, known to be such by the defendant Swaran Jain." It also instructed that "good faith" was a defense to this charge, explaining that Dr. Jain acted in good faith if he believed he was being paid for promoting North Hills, not for referring patients.

We agree with the district court's resolution of this issue. The word "willful" has many meanings and must be construed in light of its statutory context. <u>Ratzlaf</u>, 114 S. Ct. at 659. Here, the elements "knowingly and willfully" were added to the statute in 1980[2] to reflect congressional concern "that criminal penalties may be imposed under current law to an individual whose conduct, while improper, was inadvertent." H.R. Rep. No. 1167, 96th Cong., 2d

---

[2]<u>See</u> Omnibus Reconciliation Act of 1980, Pub. L. No. 96-499, tit. IX, § 917, 94 Stat. 2599, 2625.

Sess. 59 (1980), <u>reprinted in</u> 1980 U.S.C.C.A.N. 5526, 5572. The reference to "inadvertent" is rather ambiguous in this context, since the traditional definition of "willfully" -- consciousness of the act -- might be sufficient to weed out inadvertent violators. But the statute also has elaborate "safe harbor" provisions, <u>see</u> § 1320a-7b(b)(3), provisions which have prompted pages of administrative agency explication, <u>see</u> 42 C.F.R. § 1001.952. This confirms that a broad "illegal remunerations" statute is like the statute at issue in <u>Ratzlaf</u> in that it potentially includes conduct that is not "inevitably nefarious." Only conduct that is inevitably nefarious, that is, "obviously 'evil' or inherently 'bad,'" warrants the traditional presumption that anyone consciously engaging in it has fair warning of a criminal violation. <u>Ratzlaf</u>, 114 S. Ct. at 661-62. Thus, we agree with the district court's decision to instruct the jury that the government must meet a heightened *mens rea* burden. See <u>Liparota v. United States</u>, 471 U.S. 419, 423-33 (1985) (knowingly using food stamp cards in an unauthorized manner requires proof that defendant knew his conduct was unauthorized); <u>United States v. Curran</u>, 20 F.3d 560, 569 (3d Cir. 1994); <u>United States v. Hern</u>, 926 F.2d 764, 767 & n.6 (8th Cir. 1991).

But that does not mean that the specific instruction adopted in <u>Ratzlaf</u> and the criminal tax cases is appropriate in this case. The statute at issue in <u>Ratzlaf</u> made criminal a willful violation of another anti-structuring statute. Because one cannot *willfully* violate a statute without knowing what the statute prohibits, the Supreme Court required proof that defendant intentionally violated a "known legal duty." <u>See</u> 114 S. Ct. at 658-59. By contrast, in the Medicare anti-kickback statute, the word "willfully" modifies a series of prohibited acts. Both the plain language of that statute, and respect for the traditional principle that ignorance of the law is no defense, suggest that a heightened *mens rea* standard should only require proof that Dr. Jain knew that his conduct was wrongful, rather than proof that he knew it violated "a

-7-

known legal duty." Therefore, the district court's definition of "willfully" correctly construed the 1980 amendment to § 1320a-7b. Hanlester Network v. Shalala, 51 F.3d 1390, 1399-1400 (9th Cir. 1995), does not persuade us to adopt defendants' position. That case is distinguishable because it involved an administrative debarment proceeding. In addition, the court adopted Ratzlaf's heightened *mens rea* standard without considering other alternatives to the general rule. Accord United States v. Neufeld, 908 F. Supp. 491, 497 (S.D. Ohio 1995).

Alternatively, we conclude that the district court's refusal to give an instruction using the Ratzlaf definition of willfully was harmless error. Dr. Jain's defense was that he did not take money from North Hills for referring patients. On direct examination, he testified that payments for patient referrals are not only "unethical" and "wrong," they are "illegal." That testimony effectively took *mens rea* out of the case, for Dr. Jain acknowledged that, if the jury disbelieved his denials, he would be guilty under his own requested instruction as well as the instruction given by the district court.

### III. The Mail Fraud Convictions.

The mail fraud statute prohibits use of the mails to execute "any scheme or artifice to defraud." 18 U.S.C. § 1341. "Essential to a scheme to defraud is fraudulent intent. . . . The scheme to defraud need not have been successful or complete. Therefore, the victims of the scheme need not have been injured. However, the government must show that some actual harm or injury was *contemplated* by the schemer." United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994) (citations and quotation omitted). Accord United States v. Sawyer, 85 F.3d 713, 725 (1st Cir. 1996). Defendants argue that the government failed to prove a scheme to defraud. We agree.

The government alleged that Dr. Jain's patients were the victims of a fraudulent referral fees scheme. But there was no evidence that any patient suffered tangible harm. So far as the trial record reflects, Dr. Jain provided quality psychological services. Each hospitalized patient required hospitalization. North Hills was as good or better than any alternative facility and provided his patients with proper care. And no patient was financially harmed by Dr. Jain's fee arrangement with North Hills.

The government argues that tangible harm is irrelevant because it proved a scheme to defraud under 18 U.S.C. § 1346, which defines "scheme or artifice to defraud" to include a scheme "to deprive another of the intangible right of honest services." Section 1346 was enacted in 1988 to overrule the Supreme Court's decision in McNally v. United States, 483 U.S. 350 (1987). Though McNally and the vast majority of earlier "intangible rights" mail fraud cases involved corrupt public officials, the government argues that § 1346 encompasses unethical violations of a private professional's fiduciary duty to provide "honest services" to his clients.

It is certainly true that the literal language of § 1346 extends to private sector schemes to defraud another of the right to "honest services." But the transition from public to private sector in this context raises troublesome issues. In a democracy, citizens elect public officials to act for the common good. When official action is corrupted by secret bribes or kickbacks, the essence of the political contract is violated. But in the private sector, most relationships are limited to more concrete matters. When there is no tangible harm to the victim of a private scheme, it is hard to discern what intangible "rights" have been violated. For example, what "honest services" do we expect from a used car salesman, beyond a truthful description of the car being sold? Thus, prior intangible rights convictions involving private sector relationships have almost invariably included proof of actual harm to the victims' tangible interests. In United States v. Garfinkel,

29 F.3d 1253, 1258 (8th Cir. 1994), for example, defendant was a University of Minnesota psychiatrist whose scheme deprived a financial sponsor of the valuable benefits of legitimate pharmaceutical research.

Of course, the government limits its argument to undisclosed breaches of a health care professional's fiduciary duty to his clients.[3]  But when the client was not harmed because the breach did not affect the services rendered, how has the client's right to "honest services" been violated? Even in pre-McNally cases involving public official misfeasance -- decisions whose vitality was restored by § 1346 -- we cautioned that "[e]very case of breach of public trust and misfeasance in office in connection with which some mailing has occurred does not and cannot fall within the confines of the mail fraud statute."  United States v. Rabbitt, 583 F.2d 1014, 1024 (8th Cir. 1978), cert. denied, 439 U.S. 1116 (1979); see also United States v. McNeive, 536 F.2d 1245, 1249 (8th Cir. 1976).

Fortunately, this case does not require us to define the outer limits of the private sector rights to "honest services" that are now protected by § 1346.  That statute does not stand alone -- it modifies the definition of "scheme or artifice to defraud" in § 1341.  The essence of a scheme to defraud is an intent to harm the victim.  When there has been no actual harm, "the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent."  D'Amato, 39 F.3d at 1257; see United States v. Pintar, 630 F.2d 1270, 1279-80 (8th Cir. 1980). Here, all the evidence suggests that Dr. Jain intended to provide

---

[3]The regulations of the Kansas Behavioral Sciences Regulatory Board define unprofessional conduct by a licensed psychologist to include receiving fees for the referral of clients or patients. See Kan. Admin. Regs. 102-1-10(b)(20); see also American Psychological Ass'n, Ethical Principles of Psychologists and Code of Conduct, Ethical Std. 1.27 (1992).

and did in fact provide his patients with the highest quality psychological services.  While he also extracted undisclosed, unethical referral fees from an interested third party provider, there is no independent evidence proving that he thereby intended to defraud his patients.  True, Dr. Jain did not disclose the referral fees, but a fiduciary's nondisclosure must be material to constitute a criminal scheme to defraud.  See United States v. Bronston, 658 F.2d 920, 927 (2d Cir. 1981), cert. denied, 456 U.S. 915 (1982); United States v. Brown, 540 F.2d 364, 375 (8th Cir. 1976).  There is simply no evidence that any patient would have considered Dr. Jain's relationship with North Hills material if it did not affect the quality or cost of his services to that patient.

For these reasons, we conclude the mail fraud convictions must be reversed.  The government's theory and proof bring to mind our conclusion in an early intangible rights case involving a greedy but uncorrupted public official, McNeive, 536 F.2d at 1252:

> The Government here is attempting to criminalize cupidity and we do not believe that § 1341 can be extended to that extreme . . . . [T]here must be, at a minimum, a cognizable scheme to defraud.  While we do not place our imprimatur upon McNeive's avariciousness, we fail to find from the Government's proof that McNeive engaged in a scheme to defraud the City of St. Louis of any tangible or intangible right so as to fall within the broad reaches of the mail fraud statute.

## IV. The Sentencing Cross-Appeal.

The district court sentenced Dr. Jain for his Medicare anti-kickback offense under U.S.S.G. § 2B4.1, which governs commercial bribery and kickback offenses.  That guideline mandates an increase in the base offense level if an improper benefit exceeding $2000 was conferred upon the defendant.  See U.S.S.G. §§ 2B4.1(a), (b)(1), and 2C1.1, comment. (backg'd).  The amount of the increase is determined by a cross-reference to the table in § 2F1.1.  The

district court declined to impose an increase because it found that Dr. Jain received less than $2,000 for referring one Medicare patient to North Hills. On appeal, the government argues that all of the $40,500 in referral payments should have been counted as relevant conduct because there was one common scheme or plan.

The district court's factual determination of relevant conduct is reviewed under the clearly erroneous standard. See United States v. Sheahan, 31 F.3d 595, 599 (8th Cir. 1994). Relevant conduct for sentencing purposes must be criminal conduct. Id. at 600. The district court acquitted Dr. Jain of the bribery charge, and we have acquitted him of the mail fraud charges. At the time in question, Medicare did not reimburse payments for psychologist services, so there is no factual basis to presume that the Jain/North Hills fee arrangement targeted Medicare patients. In these circumstances, while a sentencing court *may* consider conduct for which the defendant has been acquitted, see United States v. Galloway, 976 F.2d 414, 424 n.6 (8th Cir. 1992) (en banc), cert. denied, 507 U.S. 974 (1993), we conclude that the district court's findings regarding relevant conduct are not clearly erroneous. See United States v. Balano, 8 F.3d 629, 631 (8th Cir. 1993).

The convictions of Dr. Jain and the Center for Mental Health Services, Inc., for violating the Medicare anti-kickback statute, 42 U.S.C. § 1320a-7(b), are affirmed. The district court's determination of relevant conduct for purposes of sentencing Dr. Jain for that offense is affirmed. Defendants' convictions for violating the federal mail fraud statute are reversed and the cases are therefore remanded for resentencing.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.